JAMES G. IVINS v. HENRY R. ACKERSON.

By force of the statute relating to fences, a division fence may be divided between the owners by parol agreement.

On motion for a new trial on a case certified from the Monmouth Circuit.

This suit was for the neglect of the defendant in maintaining a certain part of a division fence between his land and that of the plaintiff. It appeared that these parties were the occupiers of coterminous lands; and the evidence showed that about fourteen years before the trial the landlord of the plaintiff, and the defendant, being the owners of said lands, " divided, by a parol agreement, the line fence between them, and that each assumed the maintenance of a certain half or share of said fence; and that through the portion of the fence thus assigned to the said defendant," the cattle of defendant came upon the plaintiff's land, and did the damage complained of.

A verdict was rendered for the plaintiff; the question of law arising in the case being reserved.

Argued at November Term, 1875, before BEASLEY, CHIEF JUSTICE, and Justices DEPUE and VAN SYCKEL.

For the motion, *Robbins.*

Contra, *Beekman.*

The opinion of the court was delivered by

BEASLEY, CHIEF JUSTICE. This case raises but a single question—the point being, whether an unwritten partition of a line fence, made by the owners of the contiguous lands, is, in a legal sense, valid?

The argument addressed to the court against the legality of such a compact went wholly on the ground that it was void, as it was not in writing, by force of that clause in the statute of frauds, which declares that no action shall be brought " upon any contract or sale of lands, tenements, or hereditaments, or any interest in or concerning them." The fences set up to protect the land from intrusion, it was said, are a part of the freehold, as much so as houses or other

buildings; they go with the title, and therefore a contract concerning them is a contract concerning the land. This view is specious, but it is not sound. It rests upon two assumptions, neither of which, I think, can be conceded. The first of these is, that a fence is, out and out, a part of the land. This is not so; it is a fixture, and when annexed by the owner, will, like similar adjuncts, run with the land; but it has been abundantly adjudged, that oral contracts touching fixtures of this nature, are not inoperative by reason of the statute in question. *Hallen* v. *Runder*, 1 *Cr. M. & R.* 266 ; *Evans* v. *Roberts*, 5 *B. & C.* 829. The second erroneous premiss of the argument is, in assuming that if the fence be a part of the land, it follows that oral contracts cannot be made with respect to it. But the scope of the statute is by no means so broad as this. Its office is to interdict the transfer of any interest in the land by a contract not put in writing. This is its purpose, and it goes no further. No one would maintain that an agreement to do repairs to a fence, or to a building, or to work for wages upon land, would be invalidated by the statute. Such matters may be said, taking the words in a wide sense, to be contracts concerning the land, but such is not the sense of the statutory words. The purpose of the act is well expounded by Judge Spencer in the case of *Frear* v. *Hardenbergh*, 5 *Johns. R.* 275, this being his language : " The statute could have in view to avoid such agreements in relation to lands, as rested in parol, only where some interest was to be acquired in the land itself, and not such as were collateral, and by which no kind of interest was to be gained by the agreement in the land." The consequence is, that the argument which predicates that the fence is, in every respect, the same as the land, and that every contract, even though it has but a collateral reference to land, is avoided by the statute, cannot lead to a legitimate conclusion.

Nor is it anything to the present purpose, that by the principles of the common law the obligation to maintain fences arose only out of prescription or covenant. That a duty of such permanence, and operating as a burthen on the

land upon which it fell, could not be otherwise created, was reasonable enough, and altogether consistent with legal rules. And that such were the only sources of the obligation is apparent from a number of cases in the Year Books; and where the right to have the enclosure maintained came from prescription, a special remedy was afforded in the writ *curia claudenda;* but in case it grew out of an indenture, the owner, as Fitzherbert certifies to us, was put to his writ of covenant. And in some of the modern cases the view has been taken that a covenant to keep up a partition fence, is a covenant which runs with the land within the meaning of a stipulation to convey free of all encumbrances. *Blain* v. *Taylor,* 19 *Abb. Pr. R.* 228; *Bronson* v. *Coffin,* 108 *Mass.* 175. But this doctrine that the obligation to maintain a fence, as a permanent structure, must originate in a covenant, express or implied, has no very close affinity to the subject of our present inquiry. The contract to be tested is not a parol agreement to maintain the fence; the duty of doing that is imposed by the statute regulating fences; but the question is with respect to the partition of the fence thus required to be maintained.

Such a partition does not, obviously, confer any interest in the land. It does not even transfer any right to the fence, or any part of it. It does not create any new duty, nor does it impose any new burthen. Its whole effect is to assign to each party his share of the duty which the land requires to be performed. "The place," says the act, (*Nix. Dig.* 332, *pl.* 4,) "where any partition fence is, or shall be made, shall be equally divided, &c., and each party shall take an equal share of such fence to make or amend and maintain, so that it may be known which part thereof is his own; and, if the parties cannot agree in making such division, then any two of the township committee, &c., shall, &c., make such division, and determine the part or share of such fence which each party is to make or amend and maintain; which determination, being delivered to each of the parties in writing, shall be binding on such parties," &c. In this language

there is certainly nothing that appears to indicate a purpose to require the division of the fence, when agreed upon by the owners, to be put in writing. In truth, the contrary is to be inferred from the fact, that when the division is made by the township officers a writing is called for, but when effected by the land-owners there is no such requirement. Nothing can be clearer than that, in case of a voluntary division, there is no formality attending such act appointed by the statute. The subject is left to the regulation of ordinary legal rules, and I can perceive nothing in such rules that prohibits the doing of the act in question by parol. It would be singular, indeed, if such act so done should be deemed invalid, when we remember the great effect which the law gives to the unwritten agreement of the parties with respect even to the boundaries of their lands. There are cases which hold that the verbal settlement by the owners of contiguous lands of the boundary line between their possessions is absolutely conclusive. *Davis* v. *Townsend,* 10 *Barb.* 333; *Vosburgh* v. *Teator,* 32 *N. Y. R.* 561. If an uncertain division line of the land itself is thus ascertainable, it would seem out of the question to deny that the uncertain division line of the fence is similarly ascertainable. But, without placing much stress in this analogy, I am satisfied that the distribution of this fence, made by the parties referred to in this case, was valid in law; and this view, it is believed, harmonizes with the ordinary practice of land-owners. No doubt arrangements of this kind are sometimes committed to writing, and when so executed the statute provides a mode for recording them; but such a procedure is not often adopted.

The verdict should be allowed to stand.